**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 Reorganization |
| THE 800 BUILDING, LLC,[1] | Case No. 15-17314 |
| Debtor. | Hon. Pamela S. Hollis |

**NOTICE OF MOTION**

TO: See attached Service List

     **PLEASE TAKE NOTICE** that on **Thursday, May 21, 2015 at 10:00 a.m. Central Time**, or as soon thereafter as counsel may be heard, the undersigned will appear before United States Bankruptcy Judge Pamela S. Hollis, or any other judge sitting in her stead, in Courtroom 644 in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, and then and there present the attached *Motion for Entry of: (I) an Order (A) Approving 800 City Apartments LLC as the Stalking-Horse Bidder in Connection with the Sale of the Debtor's Apartment Building and Related Assets; (B) Approving Bidding Procedures and Bid Protections; (C) Scheduling an Auction and a Sale Hearing; (D) Approving the Form and Manner of Notice Thereof, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) After Further Notice and a Hearing, an Order (A) Approving a Purchase and Sale Agreement; (B) Authorizing the Sale of The 800 Building Free and Clear of All Liens, Claims, Encumbrances, and Interests; (C) Authorizing the Assumption and Assignment of Contracts and Leases; and (D) Granting Related Relief* (the "***Motion***"), a copy of which is hereby served upon you, at which time and place you may appear as you see fit.

---

[1]    Pursuant to 11 U.S.C. § 342(c)(1), the last four digits of the Debtor's federal tax identification number are: 2596. The location of the Debtor's place of business is 800 South 4th Street, Louisville, Kentucky 40202, and its address for notice purposes is 1016 West Hollywood Avenue, Chicago, Illinois 60660, Attn: Leon Petcov, Manager.

Dated: May 15, 2015

Respectfully submitted,

**THE 800 BUILDING, LLC**

By:  _/s/ Phillip W. Nelson_
      One of Its Attorneys

David J. Fischer
Phillip W. Nelson
LOCKE LORD LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: 312-201-2000
Facsimile: 312-201-2555
david.fischer@lockelord.com
phillip.nelson@lockelord.com
_Proposed Counsel for the Debtor_

2

## Service List

**Via Overnight Delivery:**

2006 Heyburn Building, LLC
Attn: Leon Petcov, Manager
332 W. Broadway
Louisville, KY  40203

Chase Environmental Group, Inc.
Attn: Michael Mills, Reg'd Agent
11450 Watterson Ct.
Louisville, KY  40299

Commercial Management, LLC
Attn: Leon Petcov, Manager
332 W. Broadway, Ste. 201
Louisville, KY  40203

Department of the Treasury, IRS
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA  19114

Evens Time, Inc.
Attn: Earl Mullins Jr., Reg'd Agent
1012 South Forth St.
Louisville, KY  40203

Fine Homes, LLC
Attn: Alex Loyfman, Reg'd Agent
4117 W. Oakton
Skokie, IL  60076

International Bank of Chicago
Attn: John Benson, Exec. VP & COO
1210 Central Avenue
Wilmette, IL  60091

IPFS Corporation
Attn: Corp. Service Co., Reg'd Agnt
421 W. Main Street
Frankfort, KY  40601

JBS & Assocs. Accnts and Consltants
Attn: Jeffrey B. Stolberg, Pres.
3700 W. Devon Ave., Ste. E
Lincolnwood, IL  60712

Kentucky Department of Revenue
Legal Branch - Bankruptcy Section
P.O. Box 5222
Frankfort, KY  40602

Louisville Gas & Electric
P.O. Box 9001960
Louisville, KY  40290-1960

Louisville Water Company
Attn: Barbara Dickens, Reg. Agnt
550 S. 3rd St.
Louisville, KY  40202

AM 49850414.1

Matherly Land Consultants, PPLC
Attn: Al Matherly, Reg'd Agent
1302 Tycoon Way
Louisville, KY  40213

Rentpath, Inc.
Attn: C T Corp. Sys., Reg'd Agent
1201 Peachtree St, NE
Atlanta, GA  30361

Republic Bank of Chicago
Attn: William Sperling, President and CEO
2221 Camden Ct., Fl. 1
Oak Brook, IL  60523

Rumpke of Kentucky, Inc.
Attn: C T Corp. Sys., Reg'd Agent
306 W. Main St., Suite 512
Frankfort, KY  40601

The Murphy Elevator Co.
Attn: D. Gregory Carlisle, Reg. Agt
128 E. Main St.
Louisville, KY  40202

Tikijian Associates
Attn: George Tikijian, President
3755 E. 82nd St., Ste. 265
Indianapolis, IN  46240

Wyatt, Tarrant & Combs, LLP
Attn: Michael Vincenti, Partner
500 W Jefferson St., Ste. 2800
Louisville, KY  40202

Louisville Gas & Electric
Attn: Registered Agent
220 West Main Street
Louisville, KY  40202

800 City Apartments LLC
c/o Jonathan R. Borenstein, Partner
Honigman Miller Schwartz and Cohn LLP
39400 Woodward Avenue, Suite 101
Bloomfield Hills, MI  48304-5151

AM 49850414.1

## Certificate of Service

I, Phillip W. Nelson, an attorney, certify that I caused a copy of the foregoing *Notice of Motion* and the related the *Motion for Entry of: (I) an Order (A) Approving 800 City Apartments LLC as the Stalking-Horse Bidder in Connection with the Sale of the Debtor's Apartment Building and Related Assets; (B) Approving Bidding Procedures and Bid Protections; (C) Scheduling an Auction and a Sale Hearing; (D) Approving the Form and Manner of Notice Thereof, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) After Further Notice and a Hearing, an Order (A) Approving a Purchase and Sale Agreement; (B) Authorizing the Sale of The 800 Building Free and Clear of All Liens, Claims, Encumbrances, and Interests; (C) Authorizing the Assumption and Assignment of Contracts and Leases; and (D) Granting Related Relief* to be served on the foregoing Service List via overnight delivery on the date hereof.

Date: May 15, 2015

*/s/ Phillip W. Nelson*

Phillip W. Nelson
LOCKE LORD LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: 312-201-2000
Facsimile: 312-201-2555
phillip.nelson@lockelord.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 Reorganization |
| THE 800 BUILDING, LLC,[1] | Case No. 15-17314 |
| Debtor. | Hon. Pamela S. Hollis |

**MOTION FOR ENTRY OF: (I) AN ORDER
(A) APPROVING 800 CITY APARTMENTS LLC AS THE STALKING-HORSE
BIDDER IN CONNECTION WITH THE SALE OF THE DEBTOR'S APARTMENT
BUILDING AND RELATED ASSETS; (B) APPROVING BIDDING PROCEDURES
AND BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND A SALE
HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(E) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT
OF CONTRACTS AND LEASES, AND (F) GRANTING RELATED RELIEF;
AND (II) AFTER FURTHER NOTICE AND A HEARING, AN ORDER (A) APPROVING
A PURCHASE AND SALE AGREEMENT; (B) AUTHORIZING THE SALE OF THE 800
BUILDING FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CONTRACTS AND LEASES; AND (D) GRANTING RELATED RELIEF**

The 800 Building, LLC, as debtor and debtor in possession (the "***Debtor***"), by and through its undersigned counsel, hereby moves this Court (this "***Motion***"), and states as follows:

**Preliminary Statement**

1.      This Motion, and the Debtor's chapter 11 filing, arises out of the Debtor's need to move forward expeditiously with a sale of its principal asset, a 246-unit residential high-rise in downtown Louisville, Kentucky known as "The 800 Building.  The Debtor, and its related debtor-affiliate 1016 West Hollywood, LLC — whose case is presently pending before Judge Jacqueline Cox in this district — along with certain of their non-debtor affiliates have reached agreements to resolve their secured debt with their lenders, International Bank of Chicago and

---

[1]    Pursuant to 11 U.S.C. § 342(c)(1), the last four digits of the Debtor's federal tax identification number are: 2596. The location of the Debtor's place of business is 800 South 4th Street, Louisville, Kentucky 40202, and its address for notice purposes is 1016 West Hollywood Avenue, Chicago, Illinois 60660, Attn: Leon Petcov, Manager.

Republic Bank of Chicago.  To complete that restructuring, the Debtor and its affiliates need the liquidity that will come from the sale of The 800 Building.

2.      Prior to the Petition Date, the Debtor engaged in an extensive, months-long effort to market The 800 Building and reached an agreement with a capable, well-funded purchaser to sell The 800 Building for approximately $20.65 million.  After paying off the Debtor's secured debts and costs of sale, the Debtor will be left with approximately $3.5 million in proceeds — more than enough to pay all of the Debtor's unsecured debts and pay a dividend to the Debtor's equity owners, Leon and Helen Petcov.

3.      Unfortunately, the Petcovs are in the midst of a dispute with one of their creditors who, having learned of the imminent sale of The 800 Building, has filed a *lis pendens* against The 800 Building to block the sale.  The Debtor believes that this creditor, in fact, has no claim against the Debtor or its assets and that — in any event — that claim can be resolved out of the proceeds of the sale.  Nevertheless, the title company has refused to insure over the creditor's *lis pendens*, and removal of the *lis pendens* through available state-court processes would imperil the Debtor's ability to close the sale and would result in irreparable harm to the Debtor's estate. Specifically, the sale of The 800 Building (which was originally intended to close earlier this year) has already undergone delays due to the need to resolve diligence concerns regarding an underground storage tank at the property (which have now been fully resolved).  However, the proposed purchaser is now facing a hard deadline on the expiration of its financing commitment on June 15, 2015.  Additionally, under the terms of the Debtor's forbearance with Republic Bank of Chicago, the Debtor will be obligated to the bank for a $500,000 forbearance fee if the bank's loans are not repaid by June 15, 2015.

4.     The Debtor and the Proposed Purchaser (as defined below) have concluded that sale of The 800 Building pursuant to section 363(f) of the Bankruptcy Code, with all liens, claims, encumbrances, and interests attaching to the proceeds is certainly the best, and perhaps the only, means for the Debtor to complete the sale in a timely manner and obtain the benefits the doing so offers and avoid the costs that failing to do so will entail.  To supplement the Debtor's prepetition marketing efforts, the Proposed Purchaser has agreed to serve as a stalking-horse for an expedited sales process, thus providing additional assurances that the value to be obtained from the sale will be the highest and best that can be realized under the circumstances. The Proposed Purchaser's agreement to participate in this process in contingent upon certain stalking-horse protections, described below, and the Debtor's commitment to complete the sale process and obtain authority to close The 800 Building sale no later than June 10, 2015.

5.     Accordingly, as set forth below, the Debtor believes that it is essential to move forward with the sale process described below as quickly as possible and, in all events, complete the sale of The 800 Building by June 10, 2015.  The Debtor respectfully submits that doing so will maximize the value of the Debtor's assets while avoiding irreparable harm to the Debtor's the estate in the form of further forbearance and litigation costs.

**Relief Requested**

6.     By this Motion, the Debtor respectfully requests that this Court enter: (a) an order, substantially in the form attached hereto (the "***Bidding Procedures Order***"): (i) approving 800 City Apartments LLC (the "***Proposed Purchaser***") as the stalking-horse bidder for the Debtor's apartment building and related assets located at 800 South 4th Street, Louisville, Kentucky ("***The 800 Building***"), as more particularly defined in and pursuant to the proposed Purchase and Sale Agreement attached hereto with all amendments as **Exhibit A** (the "***Proposed Purchase***

*Agreement*") and authorizing the Debtor to pay the Proposed Purchaser a break-up fee of $618,000 (the "***Break-Up Fee***") and reimbursement of out-of-pocket costs of up to $50,000 (the "***Expense Reimbursement***" and, together with the Break-Up Fee, the "***Stalking-Horse Protections***") if a competing bidder is approved by this Court as the Successful Bidder (as defined below), (ii) approving the bidding procedures and bid protections attached hereto as **Exhibit B** (the "***Bidding Procedures***"), (iii) scheduling an auction of The 800 Building (the "***Auction***") and a hearing (the "***Sale Hearing***") to approve the results of Auction and the sale of The 800 Building free and clear of all liens, claims, encumbrances, and interests (the "***Sale***"), (iv) approving the form and manner of notice of the Auction and the Sale attached as **Exhibit C** (the "***Sale Notice***"), (v) approving procedures for the assumption and assignment of executory contracts and unexpired leases (the "***Contracts***"), and (vi) granting related relief; and (b) at the conclusion of the Sale Hearing, an order substantially in the form attached hereto as **Exhibit D** (the "***Sale Order***") (i) approving a  purchase and sale agreement for the Sale, (ii) approving the results of the Auction and authorizing the Sale of The 800 Building to the Successful Bidder, (iii) authorizing the assumption and assignment of the Contracts, and (iv) granting related relief.

7.      In support of this Motion, the Debtor submits the declarations of; (a) Leon Petcov, the Debtor's managing member, attached hereto as **Exhibit E** (the "***Petcov Declaration***"); and (b) George Tikijian, Senior Managing Director of Tikijian Associates, the Debtor's prepetition real estate broker and advisor involved in the Debtor's marketing of The 800 Building, attached hereto as **Exhibit F** (the "***Tikijian Declaration***").  In further support of this Motion, the Debtor respectfully states as follows.

**Jurisdiction**

8.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

9.      Venue in this Court is proper under 28 U.S.C. § 1408.

10.     The bases for the relief requested in this motion are sections 363, 1123, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

**Background**

**I.       The Debtor and The 800 Building**

11.     On or about May 15, 2015 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its property as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no request for the appointment of a trustee or examiner has been made in this chapter 11 case (the "***Chapter 11 Case***"), and no official committees have been appointed or designated.

12.     The Debtor is an Illinois limited liability company that owns and operates two adjacent but related rental properties in downtown Louisville, Kentucky: (a) a 246-unit residential apartment building known as The 800 Building, with a street address of 800 South 4th Street; and (b) a 48-slot parking garage, with a street address of 820 South 4th Street (the "***Garage***").  The 800 Building is a 29-story, 290-foot skyscraper built in 1963.  The Debtor acquired The 800 Building in 2002 for approximately $5.5 million and renovated the building in 2004.

13.     The Debtor has successfully operated The 800 Building for more than a dozen years.   Presently, The 800 Building enjoys a 78% percent occupancy rate and generates approximately $140,000 in monthly gross revenue, more than enough to service the debt on the Debtor's property and its operating expenses.

## II.     The Debtor's Capital Structure

14.     The Debtor is owned by Leon and Helen Petcov (the "*Petcovs*") and is managed by Leon Petcov.

15.     The Debtor is the borrower under a loan agreement with Republic Bank of Chicago with a balance of approximately $16.46 million (the "*Republic Bank Debt*"), which is secured by a first-priority lien on substantially all of the Debtor's assets, including mortgages on The 800 Building and the Garage (the "*Republic Bank Loan*").   The Republic Bank Debt is also secured by first-priority mortgages on two parking lots in Louisville, Kentucky that are owned by non-debtor affiliates of the Debtor, 233 W. Chestnut, LLC and 601 S. 3rd Street, LLC (the "*Non-Debtor Affiliate Parking Lots*").

16.     The Debtor is also the borrower under a promissory note issued to International Bank of Chicago ("*IBC*") with a balance of approximately $457,000, which is secured by a second-priority mortgages on The 800 Building and the Garage.

## III.     Events Leading Up to the Debtor's Chapter 11 Filing

### A.     The Petcovs' Financial Difficulties

17.     On May 5, 2008, the Debtor's members, the Petcovs, entered into a certain Article of Agreement for Warranty Deed (the "*Contract for Deed*") pursuant to which the Petcovs agreed to purchase the home of Michael and Faina Loyfman (the "*Loyfmans*") commonly known at 70 Harbor Street, Glencoe, Illinois (the "*Residence*"), title to which is held in the name

of Fine Homes LLC, an Illinois limited liability company owned by the Loyfmans and managed by Michael Loyfman ("***Fine Homes***").

18.     At the time that the Petcovs entered into the Contract for Deed, the Residence secured a loan to Fine Homes by 1st Equity Bank Northwest ("***1st Equity***") in the principal amount of approximately $4.5 million (the "***1st Equity Loan***").  In late 2009, the Petcovs agreed to guarantee the 1st Equity Loan and also caused another one of their limited liability companies, 1016 West Hollywood LLC ("***1016 W. Hollywood***") to grant Fine Homes a third-priority mortgage on 1016 W. Hollywood's property to guaranty the Petcovs' obligations under the Contract for Deed and a fourth-priority mortgage on 1016 W. Hollywood's property in favor of 1st Equity to secure the Petcovs' guaranty of the 1st Equity Loan.

19.     As the 2008-2009 Financial Crisis began to gain momentum, the Petcovs rental properties, including 1016 W. Hollywood and the Debtor, encountered financial difficulty as occupancy rates and current rent payments slipped.

20.     The Petcovs were unable to make the required payments on the Contract for Deed and a related promissory note with Fine Homes executed by Leon Petcov to finance part of the obligations under the Contract for Deed.  Without these payments from the Petcovs, Fine Homes was unable to pay the 1st Equity Loan, which went into default.  As a result, the Loyfmans caused Fine Homes to file a lawsuit against the Petcovs on the Contract for Deed and related promissory note in the Circuit Court of Cook County, Illinois, Law Division (the "***Law Division***"), captioned *Fine Homes v. Leon and Helen Petcov*, Case No. 13 L 004334 (the "***Fine Homes Lawsuit***")

21.     In addition, 1016 W. Hollywood missed a monthly payment in August 2012 on its $3.6 million first-lien mortgage and was unable to pay the second installment of its 2011 real

property taxes.  Among other things, this caused a default under 1016 W. Hollywood's first-lien term loan, then held by an entity called VCP 1016 Hollywood LLC, which started an action to foreclose on 1016 W. Hollywood's rental property in the Circuit Court of Cook County, Illinois, Chancery Division (the "*Chancery Division*"), captioned *VCP 1016 Hollywood LLC v. 1016 W. Hollywood LLC et al.*, Case No 12 CH 34901 (the "*Hollywood Foreclosure*").

22.    At the time VCP 1016 Hollywood LLC commenced the Hollywood Foreclosure, IBC held a $1.3 million second-lien position on 1016 W. Hollywood's rental property. However, IBC also held loans with several of the Debtor's affiliates, all of which were owned by the Petcovs, totaling approximately $24.2 million — all of which debt was also guaranteed by Leon Petcov (collectively, the "*IBC Loans*").  Ultimately, however, IBC acquired the VCP 1016 Hollywood LLC first-lien loan to protect its second-lien position and its cross-collateralized interests in the Debtor and its affiliates.

23.    On or about June 29, 2012, IBC, Leon Petcov, the Debtor, 1016 W. Hollywood, and their other affiliates indebted to IBC on the IBC Loans entered into a certain Loan Modification and Forbearance Agreement (the "*Forbearance Agreement*") pursuant to which, among other things, the parties agreed to consolidate certain of the IBC Loans and reduce the overall, cross-collateralized indebtedness to approximately $15.5 million.

24.    Ultimately, however, IBC and 1016 W. Hollywood reached an impasse in resolving the Hollywood Foreclosure, and 1016 W. Hollywood file a voluntary petition for protection pursuant to chapter 11 of the Bankruptcy Code, commencing a chapter 11 case that is presently pending before this Court, captioned *In re 1016 West Hollywood LLC*, Case No. 14-02696 (the "*Hollywood Chapter 11 Case*").

25.     At about the same time, 1st Equity stepped up its efforts to enforce its mortgage on the Residence and collect on the Petcovs' guaranties of the 1st Equity Loan, commencing a foreclosure action against Fine Homes and the Petcovs with respect to the Residence (filed in the Chancery Division), captioned *1st Equity Bank Northwest v. Fine Homes LLC, et al.*, Case No. 14 CH 04372, and a breach-of-contract suit against the Petcovs with respect to the guaranties (filed in the Law Division), captioned *1st Equity Bank Northwest v. Leon and Helen Petcov*, Case No. 14 L 008068.

**B.     The Marketing of The 800 Building and the Proposed Purchase Agreement**

26.     During the financial downturn and while the Petcovs struggled to deal with IBC, 1st Equity, and Fine Homes and the Loyfmans, the Debtor also encountered difficulty in meeting its obligations under the Republic Bank Loan, and the Petcovs and the Debtor agreed that, in exchange for a forbearance and extension of the Republic Bank Debt (the "***Republic Bank Forbearance***"), the Debtor would proceed with efforts to market The 800 Building and pay-off the Republic Bank Loan.  Moreover, because the value of The 800 Building exceeds the amount of the Debtor's secured and unsecured debt, the Petcovs anticipated that selling The 800 Building would free up cash that could be used to resolve their disputes with IBC, 1st Equity, and Fine Homes.

27.     The Republic Bank Extension called for, among other things, two forbearance fees to be added to the Republic Bank Debt: (a) a $500,000 fee if the Republic Bank Debt was not paid in full by the end of January 2015; and (b) a second $500,000 fee that will come due if the Republic Bank Debt is not paid in full by June 15, 2015.

28.     However, because the value of The 800 Building exceeds the amount of the Debtor's secured and unsecured debt, the Petcovs anticipated that selling The 800 Building

would free up cash that could be used to resolve their disputes with IBC, 1st Equity, and Fine Homes.  Accordingly, the Debtor moved forward with marketing efforts quickly.

29.     Beginning in April 2014, The Debtor engaged Tikijian Associates, a brokerage firm specializing in the sale of multi-unit housing properties in Indiana and Kentucky, to assist with the marketing of The 800 Building.  As described more fully in the Tikijian Declaration, the Debtor and Tikijian Associates engaged in an extensive effort to market The 800 Building over the course of 9 months, which included interest by more than 12 potential purchasers.

30.     Ultimately, on or about November 21, 2014, the Debtor received an offer to purchase The 800 Building from Village Green Development Holding LLC ("*Village Green*").  In light of the Debtor's extensive marketing efforts and Village Green's track record as a real estate owner and its demonstrated ability to close, the Debtor concluded represented the best offer for The 800 Building.

31.     On or about December 31, 2014, the Debtor and Village Green entered into the Proposed Purchase Agreement.  The Debtor and Village Green have subsequently amended the Purchase Agreement on a number of occasions to reflect certain changed circumstances with respect to the principal terms of the proposed sale, including substitution of Village Green for its subsidiary, 800 City Apartments LLC, defined above as the "Proposed Purchaser."  A true copy of the Proposed Purchase Agreement with all amendments is attached hereto as <u>Exhibit A</u>.

32.     Pursuant to the Proposed Purchase Agreement, Village Green and the Proposed Purchaser have agreed to pay $20.65 million for The 800 Building (the "*Proposed Purchase Price*").  The Proposed Purchaser has also made an earnest money deposit pursuant to the terms of the Proposed Purchase Agreement totaling $1.1 million.  The Debtor is generally current with respect to its unsecured, ordinary-course-of-business obligations.  Furthermore, as discussed

above, total secured indebtedness on the Debtor's property totals approximately $16.92 million, meaning that the Debtor will have proceeds of approximately $3.5 million from the Sale (after expenses) to (a) satisfy and unsecured obligations not assumed by the Proposed Purchaser pursuant to the Proposed Purchase Agreement and (b) contribute to the resolution of the Debtor's cross-collateralized obligations for the IBC Loans as described below under a Restructuring Support Agreement (defined below).

C.      **The Restructuring Support Agreement with IBC**

33.     Due to the cross-collateralization and cross-default provisions under the IBC Loan agreements, 1016 W. Hollywood's defaults and chapter 11 filing technically created cross-defaults under the remainder of the IBC Loans, including the Debtor's second-lien mortgage to IBC.  Moreover, because the IBC Loans were cross-collateralized, the Debtor stands liable to IBC for all of the IBC Loan debt.

34.     With the opportunity created by the Proposed Purchase Agreement, the Debtor and its affiliates reached out to IBC in an effort to work out the IBC Loans and resolve the cross-defaults and cross-collateralization issues resulting from 1016 W. Hollywood's defaults and chapter 11 filing.

35.     As a result, IBC and the Debtor and its affiliates obligated on the IBC Loans have finalized the terms for a restructuring of the IBC Loans and are in the process of finalizing a Restructuring Support Agreement that will result in a pay-off of IBC's $456,000 second-lien loan on the Debtor's property and a restructuring of the remaining IBC Loan debt.[2]  First, the balance on 1016 W. Hollywood's portion of the IBC Loans will be reduced to $5 million, and 1016 W. Hollywood will have until the end of 2016 to repay or refinance the debt.  Second, the

---

[2]     Separately, the Debtor intends to file a motion pursuant to Rule 9019 of the Federal Rule of Bankruptcy Procedure to authorize it to enter into a Restructuring Support Agreement once it is finalized.

$10.5 million balance of the IBC Loan debt will be consolidated into a $7.75 million "A Note," secured by IBC's existing liens on the property of the Debtor and its affiliates, and a $2.5 million "B Note" for which Mr. Petcov will be the sole obligor — resulting in a substantial reduction of the Debtor's secured obligations.  The Debtor and its affiliates will have until June 30, 2018 to repay the A Note, during which time the note will accrue simple interest at 4.5 percent *per annum*, payable monthly, with the principal amortized over 25 years.

36.     The IBC Loan restructuring thus represents a substantial opportunity for the Debtor and its affiliates to reduce their secured obligations and set themselves up on a manageable glide path to repay or refinance the IBC Loans that will avoid costly litigation and, potentially, the distressed litigation of their property through foreclosure — thereby preserving value for all constituencies.

**D.      The Need for the Debtor's Chapter 11 Filing and This Motion**

37.     Critically, the Restructuring Support Agreement and the workout of the IBC Loans it contemplates depend upon the ability of the Debtor to complete the Sale of The 800 Building to generate the liquidity to (a) pay off the Debtor's existing obligations and (b) fund the Restructuring Support Agreement.

38.     However, when 1016 W. Hollywood filed its third amended plan of reorganization and the related disclosure statement, which explained the terms of the Restructuring Support Agreement and the Sale of The 800 Building as the source of the funds, Fine Homes filed a *lis pendens* against The 800 Building based on the Fine Homes Lawsuit — even though the Debtor is not even a defendant in that lawsuit and Fine Homes is not a creditor of the Debtor.

39.     The Debtor and the Proposed Purchaser are prepared to close the Sale and, indeed, had intended to complete the sale on or about May 1, 2015.  However, as a result of the *lis pendens*, the title company would not issue a policy for the Sale.

40.     Fine Homes is not a creditor of the Debtor and has no lien on The 800 Building. Moreover, the Propose Purchaser needs to complete the Sale shortly and has already had to obtain an extension on its financing commitment.  The Debtor stands to lose the present opportunity to complete the Sale and restructure its obligations if it cannot close the Sale over the *lis pendens* in an expedited fashion.

41.     Moreover, under the terms of the Republic Bank Forbearance, the bank will charge the Debtor a forbearance fee of $500,000 if the Republic Bank debt is not paid in full by June 15, 2015.

42.     To complete the Sale and obtain the benefits of effectuating the Restructuring Support Agreement, the Debtor has concluded that this Chapter 11 Case and a sale of The 800 Building pursuant to section 363(f) of the Bankruptcy Code on expedited basis is the necessary next step.

43.     Accordingly, prior to the Petition Date, the Debtor and the Proposed Purchaser negotiated the terms of the Stalking-Horse Protections and the timing for the bankruptcy sale process and entered into that certain Thirteenth Amendment to Purchase and Sale Agreement (attached to this Motion as Exhibit A along with the Propose Purchase Agreement and the prior amendments thereto).

44.     The Debtor's chapter 11 filing and this Motion follow.

## The Debtor's Sale Process for The 800 Building

45.     By this Motion, the Debtor respectfully requests that this Court enter the Bidding

Procedures Order that: (a) approves the Proposed Purchaser (*i.e.*, 800 City Apartments LLC) as

the stalking-horse bidder for The 800 Building, pursuant to the Proposed Purchase Agreement

and approves the Stalking-Horse Protections; (b) approves the Bidding Procedures; (c) schedules

the Auction and the Sale Hearing; (d) approves the Sale Notice; and (e) approves procedures for

the assumption and assignment of the Contracts.

46.     In connection with the Bidding Procedures Order, the Movants respectfully

request that the Court approve the following deadlines, subject to modification:

    a.    *Bid Deadline*: **May 28, 2015 at 5:00 p.m. Central Time**, as the deadline by which all Bids other than the Stalking-Horse Bid (as defined herein) for The 800 Building (as well as the deposit and all other required documentation under the Bidding Procedures for Qualified Bids) must be actually received pursuant to the Bidding Procedures (the "***Bid Deadline***");

    b.    *Auction*: **May 30, 2015 at 10:00 a.m. Central Time**, as the date and time the Auction, one if one is needed, will be held at the offices of Locke Lord LLP, 111 South Wacker Drive, Chicago Illinois;

    c.    *Sale Objection Deadline*: **June 1, 2015 at 5:00 Central Time**, as the deadline to object to the Sale;

    d.    *Sale Hearing*: **June 2, 2015 at 9:30 a.m. Central Time**, as the date and time for the Sale Hearing; and

    e.    *Contract Assignment Objection Deadline*: **June 1, 2015 at 5:00 p.m. Central Time**, as the deadline to object to the assignment of Contracts.

47.     By this Motion, the Debtor also requests that this Court enter, at the conclusion of

the Sale Hearing, an order substantially in the form of the Sale Order that, among other things:

(a) approves the an asset purchase agreement for the Sale substantially in the form of the

Proposed Purchase Agreement; (b) approves the results of the Auction, if any, and authorizing

the Sale of The 800 Building to the Successful Bidder; and (c) authorizes the assumption and

assignment of the Contracts to the Successful Bidder.

**Bidding Procedures Order**

### I.        The Bidding Procedures

48.     To efficiently solicit, receive, and evaluate bids of a fair and accessible manner,

the Movants have developed and proposed the Bidding Procedures attached hereto as <u>Exhibit B</u>

to govern the Sale.  While the Debtor has, prior to the Petition Date, conducted an extensive

marketing process and believes that the Proposed Purchase Agreement represents the highest and

best offer for The 800 Building, the Bidding Procedures are designed to encourage potential

bidders to put their best offer forward, within the time constraints the Debtor faces, and

maximize the value of The 800 Building.  The salient points of the Bidding Procedures are as

follows:

a.    ***The Property***: Competing Bids must be for The 800 Building and all of the Contracts;

b.    ***Bid Requirements***: Any Bid (other than the Stalking-Horse Bid, as defined herein) must be submitted in writing no later than the Bid Deadline and determined by the Debtor, in its reasonable business judgment, to have satisfied the following requirements:

(i)    ***Purchase Price***: Each Bid must clearly set forth the purchase price to be paid in cash.  The Purchase Price must exceed the Stalking-Horse Bid by at least $1,050,000.00, reflecting an overbid of $382,000 (or 1.8% of the $20,650,000 Proposed Purchase Price, plus the $618,000 Break-Up Fee and $50,000 Expense Reimbursement).

(ii)    ***Deposit***: Each Bid must be accompanied by a cash deposit in the amount equal to $1 million to be held in a non-interest-bearing escrow account to be identified and established by the Debtor (the "***Deposit***").

(iii)    ***Purchase and Sale Agreement***: Each Bid must expressly include an asset purchase agreement with a blackline clearly marked to show changes requested by the Bidder against the Proposed Purchase Agreement.

(iv)   ***Same or Better Terms***: Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtor's reasonable business judgment, substantially on the same or better terms that the terms of the Proposed Purchase Agreement. Each Bid must include duly executed transaction documents necessary to effectuate the Sale (the "***Bid Documents***").

(v)   ***Demonstrated Financial Capacity, Committed Financing***: A Bidder must have, in the Debtor's reasonable business judgment, the necessary financial capacity to consummate the proposed transactions required by the Bid. Each Bid must also include committed financing, documented to the Debtor's reasonable satisfaction, that demonstrates the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid, including without limitation, the identity and the contact information of the specific person(s) or entity(s) responsible for such committed financing whom the Debtor should contact regarding such committed financing. Such funding commitments shall not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtor in its business judgment.

(vi)   ***Identity***: Each Bidder must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such), and the complete terms of such participation.  Under no circumstances may any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s) whom the Debtor should contact regarding such Bid.

(vii)   ***Contingencies, No Financing or Diligence Outs***: A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtor's reasonable business judgment, than those set forth in the Proposed Purchase Agreement.

(viii)   ***Irrevocable***: A Bidder's Bid shall be irrevocable unless and until the Debtor except a higher Qualified Bid (as defined herein) and such Bidder is not selected as the Backup Bid (as defined herein).

(ix)   ***Expenses***: Each Bidder presenting a Bid or Bids shall bear its own costs and expenses (including legal fees) in connection with the proposed transaction.

(x)      **Authorization**: Each Bid must contain evidence that the Bidder has obtained authorization or approval from its Board of Directors (or a comparable governing body acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transaction contemplated in such Bid.

(xi)      **As-Is, Where-Is**: Each Bid must include a written acknowledgment and representation that the Bidder: (A) has had an opportunity to conduct any and all due diligence regarding The 800 Building prior to making its offer; (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or The 800 Building in making its Bid; and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guarantees whatsoever, whether express, implied, by operation of law, or otherwise, regarding The 800 Building for the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's proposed Purchase and Sale Agreement.

c.      **Bid Deadline**: Each Bid must be transmitted via e-mail (in .pdf or similar format) so as to be actually received on or before **the Bid Deadline** by the Notice Parties.

d.      **The Auction**: If one or more Qualified Bids are submitted, the Debtor will conduct the Auction to determine the Successful Bidder with the highest and best Bid (the "**Successful Bid**"). If no Qualified Bids are submitted, the Debtor may adjourn or cancel the Auction. If the Auction is canceled, the Proposed Purchaser shall be designated as the Successful Bidder and the Proposed Purchase Agreement the Successful Bid.

e.      **Terms of Overbid**: During the course of the Auction, the Debtor shall, after the submission of each Overbid, promptly inform each Qualified Bidder which Overbid reflects in the Debtor's reasonable business judgment, the highest and otherwise best Bid. All Overbids at the Auction shall be in minimum increments of $250,000 in cash above the leading Bid identified at the commencement of the Auction.

f.      **Backup Bidder**: Notwithstanding anything in the Bidding Procedures to the contrary, if the Auction is conducted, the Qualified Bidder(s) with the next-highest or otherwise second-best Qualified Bid at the Auction, as determined by the Debtor in the exercise of its reasonable business judgment, shall be required to serve as the backup bidder (the "**Backup Bidder**"). The Backup Bidder(s) shall be required to keep its or their Qualified Bid(s) — or if the Backup Bidder(s) submitted one or more Overbids at the Auction, its final Overbid(s) — open and irrevocable until the closing of the transaction with the Successful Bidder(s). The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder(s).

g.   ***Stalking-Horse Bidder***:   The Proposed Purchaser will serve as the stalking-horse bidder (the "***Stalking-Horse Bidder***") and will agree to purchase The 800 Building for $20,650,000 pursuant to the Proposed Purchase Agreement (the "***Stalking-Horse Bid***").

h.   ***Stalking-Horse Protections***: If a Qualified Bid other than the Stalking-Horse Bid is selected by the Debtor at the Auction as the Successful Bid, the Stalking-Horse Bidder will be entitled to receive the  $618,000 Break-Up Fee and up to $50,000 of the Expense Reimbursement for out-of-pocket costs from the proceeds of the Sale.

49.   Importantly, the Bidding Procedures recognize the Debtor's fiduciary obligations to maximize sale value and, as such, do not impair the Debtor's ability to consider all qualified bid proposals and preserve the Debtor's right to modify the Bidding Procedures as necessary or appropriate to maximize the value of The 800 Building.

**II.        Form and Manner of Sale Notice**

50.   On or within three business days of the entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice to be served on: (a) the United States Trustee for the Northern District of Illinois (the "***U.S. Trustee***"); (b) counterparties to the Contracts (the "***Contract Counterparties***"); (c) all parties who have expressed an interest The 800 Building; (d) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in The 800 Building; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) each governmental agency that is an interested party with respect to the Sale; (h) all known creditors of the Debtor; and (i) all parties who have filed appearances or requested notices through the Court's CM/ECF system in this chapter 11 case.[3]

---

[3]   Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Contract to the Successful Bidder(s), the proposed cure amounts relating thereto, and the right, procedures, and deadline for objecting thereto, will be provided in a separate notice, attached hereto as **Exhibit G** (the "***Assumption and Assignment Notice***") to be sent to the applicable Contract Counterparties.

51.     The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and the Assumption and Assignment Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtor proposes that no other or further notice of the Sale shall be required.  Accordingly, the Debtor respectfully requests that this Court approve the form and manner of the Sale Notice.

**III.        Summary of the Assumption and Assignment Procedures**

52.     The Movants are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "***Assumption and Assignment Procedures***").   Because the Assumption and Assignment Procedures are set forth in detail in the attached Bidding Procedures Order, they are not restated herein.  Generally, however, the Assumption and Assignment Procedures: (a) fix the process by which the Debtor will serve notice on all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of the right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.   Significantly, the Assumption and Assignment Procedures provide Contract Counterparties with at least seven days' notice of the proposed assignment and such party's opportunity to object to the proposed assignment.

**Basis for Relief**

**I.       The Bidding Procedures Should Be Approved.**

53.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g., Fulton State Bank v. Schipper (In re Schipper)*, 993 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citation omitted); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by estate representative are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

54.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g., Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (in a bankruptcy sale, the "governing principle . . . is to secure the highest price for the benefit of the estate and creditors"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

55.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g., Integrated*

*Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to

maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156

(Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide

an adequate basis for comparison of offers, and [should] provide for a fair and efficient

resolution of bankrupt estates"); *In re AQP Liquidating Inc. f/k/a QT, Inc.*, No. 07-03227 (Bankr.

N.D. Ill. Nov. 28, 2007) (requiring minimum overbids to exceed purchaser's offer of $410,000

by at least $41,000 (10.0 percent of total purchase price)); *In re Comdisco, Inc.*, No. 01-24795

(Bankr. N.D. Ill. Aug. 9, 2001) (requiring minimum over bids to exceed purchaser's offer of

$610 million by at least $43.3 million (approximately 7.0 percent of total purchase price)).

56.     A break-up fee and expense reimbursement provides value to the estate by serving

as an "incentive payment" to the Proposed Purchaser who has placed the Debtor's property in

"sales configuration mode," attracts other bidders to the auction for the property, but is not the

successful bidder at that auction.  Both are intended to compensate the stalking-horse for its

opportunity costs, as well as out-of-pocket expenses, incurred in connection with pursuing the

Debtor's assets.  Here, the Break-Up Fee represents just under 3% of the Proposed Purchase

Price, that the Expense Reimbursement is limited to only $50,000 in out-of-pocket expenses

incurred by the Proposed Purchaser in connection with preparing for and participating in the

Debtor's Chapter 11 Case and the sale process.   Even with the full $50,000 of the

Reimbursement Expense, the total amount of the Stalking-Horse Protections constitute only

3.2% of the Proposed Purchase Price.  The Stalking-Horse Protections are, therefore, not

disproportionate to the value of the proposed Sale.  *See, e.g., In re OHCMC-Oswego, LLC*, Case

No. 14-05349 (Bankr. N.D. Ill. June 17, 2014) (Docket No. 77) (Doyle, J.) (approving sale

procedures that included a 3% break-up fee of $352,500 on a stalking-horse purchase price of

$11,750,000); *In re Global Crossing, Ltd.*, 295 B.R. 726, 733 (Bankr. S.D.N.Y. 2003) (observing

that "liquidating damages" provision functioned substantially like a break-up fee, court noted

approval of break-up fee of $30 million on $250 million transaction, a 12% break-up fee); *In re*

*RSL Com Primecall, Inc.*, No. 01-11457, 2002 Bankr. LEXIS 367 (Bankr. S.D.N.Y. Arp. 11,

2002) (approval of 3% break-up fee); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (break-up fees are generally permissible when reasonable in relation to bidder's

efforts and size of transaction).

57.    The Stalking-Horse Protections were negotiated by the parties in good faith and at

arms' length, and they are fair and reasonable in view of, among other things, (a) the intensive

analysis, due diligence investigation, and negotiation undertaken by the Stalking-Horse Bidder in

connection with the Sale and (b) the fact that the Stalking-Horse Bidder's efforts have

established a bid standard for other bidders interested in The 800 Building, may serve as a

catalyst for other potential bidders, and in any case, ensures that the Debtor will obtain a sale

price for The 800 Building sufficient to pay all claims.

58.    The Stalking-Horse Protections were a material inducement, and condition of, the

Proposed Purchaser's willingness to amend the Stalking-Horse Purchase Agreement to provide

for a public sale, and the Proposed Purchaser was unwilling to act as the stalking-horse bidder

without the Stalking-Horse Protections.   Furthermore, by having Stalking-Horse Bidder as a

stalking-horse for the Sale, much of the due diligence, contract negotiation and other work

necessary to submit a bid for The 800 Building will have been completed.  This will shorten the

time and lessen the cost required for prospective bidders to submit a competing Bid and will

therefore promote such Bids.  The sale of The 800 Building without a stalking-horse bidder

would be more time-consuming, more expensive, and would likely result in a reduced prospect for competitive Bids

59.     The Debtor also submits that the proposed Bidding Procedures, including the Stalking-Horse Protections, will promote active bidding from seriously interested parties and will elicit the best and highest offers available for The 800 Building.   The proposed Bidding Procedures will allow the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders will offer the best package for The 800 Building and who can demonstrate the ability to close the transaction.   In particular, the bidding procedures contemplate an open auction process with the minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

60.     The Movants submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this Court and other Courts in this District.   *See, e.g., In re OHCMC-Oswego, LLC*, Case No. 14-05349 (Bankr. N.D. Ill. June 17, 2014); *In re Qualteq, Inc.*, No. 12-05961 (Bankr. N.D. Ill. Oct. 4, 2012); *In re Giordano's Enters., Inc.*, No. 11-06098 (Bankr. N.D. Ill. Oct. 25, 2011); *In re Canopy Fin., Inc.*, No. 09-44943 (Bankr. N.D. Ill. Jan. 27, 2010);  *In re Gas City, Ltd.*, No. 10-47879 (Bank. N.D. Ill. Jan. 13, 2010): *In re Kimball Hill, Inc.*, No. 08-10095 (Bankr. N.D. Ill. Sept. 9, 2008); *In re Neumann Homes, Inc.*, 07-20412 (Bankr. N.D. Ill. Feb. 28, 2008).

**II.        The Form and Manner of the Sale Notice Should Be Approved.**

61.    Bankruptcy Rule 2002(a)(2) requires, among other things, that all creditors should receive at least 21 days' notice by mail of the Sale Hearing, unless the Court, for cause shown, shortens the time or directs another method of giving notice.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the Sale.

62.    Here, the Debtor proposes to shorten notice and provide creditors and other parties in interest with 11 days' notice of the Sale Hearing.  The Debtor must move quickly to ensure that it can complete the Sale because if the Sale does not close by June 15, 2015 at the latest, the Proposed Purchaser's financing commitment will expire and Republic Bank will charge the Debtor a $500,000 penalty for having failed to repay the Republic Bank Debt in full.

63.    In light of (a) the Debtor's extensive prepetition marketing efforts, (b) the need to consummate the Proposed Purchase Agreement prior to the expiration of the Proposed Purchaser's financing commitment, and (c) the fact that the Propose Purchase Agreement will result in proceeds sufficient to satisfy all of the Debtor's secured and unsecured obligations, the Debtor respectfully submits that cause exists to shorten notice pursuant to Bankruptcy Rule 2002.  Accordingly, the Debtor respectfully requests that the Court deem notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and the Assumption and Assignment Notice as provided for herein, good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

**III.     The Assumption and Assignment Procedures
Are Appropriate and Should Be Approved.**

64.     As set forth above, the Motion contemplates the assumption and assignment of the Contracts to the Successful Bidder(s).  In connection with this process, the Debtor believes it is necessary to establish a process by which (a) the Debtor and the Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) the Contract Counterparties can object to the assumption and assignment of the Contracts and/or related cure amounts if a dispute exists.

65.     As set forth in the Bidding Procedures Order, the Movants also request that any party that failure to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Assumption and Assignment Notice.  *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

66.     The Debtor believes that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Movants respectfully request the Court approve the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

**IV.     The Sale Should Be Approved as an Exercise of Sound Business Judgment.**

67.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See, e.g., In re Schipper*, 993 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'"); *see also In re Martin*, 91 F.2d 389, 395 (3d Cir. 1996) (citing *Schipper*); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

68.     Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company."  *Integrated Resources*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615-016 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### A.     The Sale Should Be Approved as an Exercise of Sound Business Judgment.

69.     As set forth above, the Debtor has a sound business justification for selling The 800 Building at this time, as it will allow the Debtor to satisfy its secured claims and yield proceeds that will allow the Debtor to pay all of its unsecured obligations and fund the Plan Restructuring Agreement.  The sale process outlined in this Motion presents the best opportunity to have The 800 Building be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for The 800 Building — although, given the fact that the amount of proceeds that will result from the Sale will be sufficient to pay all of the Debtor's obligations, any improvement in the purchase price for The 800 Building will redound to the benefit of the Debtor's owners.  Consequently, the ultimately successful bid or bids, after being

subject to a "market check" in the form of the Auction, will constitute, in the Debtor's reasonable business judgment, the highest or otherwise best offer for The 800 Building.

### B.      Adequate and Reasonable Notice of the Sale Will Be Provided.

70.      As described above, the Sale Notice: (a) will be served in a manner that provides at least 11 days' notice of the date, time, and location of the Sale Hearing; (b) informs interested parties of the deadlines for objecting to the Sale; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

### C.      The Sale and Purchase Price Will Reflect a Fair Value Transaction.

71.      It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (while a "section 363(b) sale transaction does not require an auction procedure, . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").  Here, the Bidding Procedures and (if Qualified Bids are received) the Auction will ensure that the Successful Bid(s) reflect the best and highest price, and thus a fair value, for The 800 Building.

### D.      The Sale and Purchase Price Will Reflect a Fair Value Transaction.

72.      The Debtor requests that the Court find that the Successful Bidder(s) are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of The 800 Building.

73.      Section 363(m) of the Bankruptcy Code provides in pertinent part:

Case 15-17314   Doc 3   Filed 05/15/15   Entered 05/15/15 17:31:24   Desc Main
Document      Page 33 of 41


> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

74.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."   While the Bankruptcy Code does not define "good faith," courts have held that the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made.  *See, e.g., In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citations omitted); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

75.     The Debtor submits the Successful Bidder(s) will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Purchase and Sale Agreement, or any marked versions thereof, will be good faith agreements on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  *First*, any Sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all negotiations will be conducted on an arm's-length, good faith basis.  Accordingly, the Debtor believes the consideration to be received pursuant to the Auction will be fair and reasonable. *Second*, the Bidding Procedures are designed to ensure that no party is able to exert undue

AM 49850414.1                                28

influence over the Sale process.  The Debtor will not choose as the Successful Bidder or Backup

Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably

be doubted, and, as may be necessary, will be prepared to present the Court through testimony or

proffer at the Sale Hearing with sufficient evidence to allow the Court to find that the "good

faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.  *Third*, any Bid(s)

that the Debtor ultimately determines to be Successful Bid(s) will have been evaluated and

approved by the Debtor in consultation with its advisors.  Accordingly, the Debtor believes that

the Successful Bidder(s) and Purchase and Sale Agreement (or marked version thereof) should

be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### E.      The Sale Should Be Approved "Free and Clear" Under § 363(f).

76.      Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and

clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such

a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale

price of the property exceeds the value of all liens on the property; (d) the interest is the subject

of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable

proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).  The term

"any interest," as used in section 363(f) of the Bankruptcy Code, is not defined anywhere in the

Bankruptcy Code.  The Seventh Circuit, however, has construed the term "any interest" to be

"very broad."  *See Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th

Cir. 2003); *Compak Co., LLC v. Johnson*, 415 B.R. 334, 338-39 (N.D. Ill. 2009).

77.      Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the Debtor's sale of The 800 Building

free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances),

except with respect to any interests that may be assumed liabilities under the applicable Purchase

and Sale Agreement. *See Compak*, 415 B.R. at 338 ("Section 363(f) authorizes bankruptcy courts to approve the sale of a debtor's property 'free and clear of any interest in such property' if one of five conditions is satisfied.").

78. The Debtor submits that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtor may possess with respect thereto, or by consenting to the Sale. The Debtor accordingly requests authority to convey The 800 Building to the Successful Bidder(s) free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

## V. The Assumption and Assignment of Contracts Should Be Approved.

### A. The Assumption and Assignment of Contracts Reflects the Debtor's Reasonable Business Judgment.

79. To facilitate and effectuate the sale of The 800 Building, the Debtor is seeking authority to assign or transfer the Contracts to the Successful Bidder(s) to the extent required by such bidders.

80. Section 365 of the Bankruptcy Code authorizes a debtor in possession to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943)

(applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard . . . .").

81.    Here, the Court should approve the decision to assume and assign the Contracts in connection with the Sale as a sound exercise of the Debtor's business judgment. The Contracts largely consist of existing leases at The 800 Building and, as such are only beneficial to the owner of The 800 Building. As such, however, they may be essential to inducing the best offer for The 800 Building. In addition, the Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases. Accordingly, the Debtor submits that the assumption and assignment of the Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of its business judgment.

### B.    Defaults Under the Assumed Contracts, if Any, Will Be Cured Through the Sale.

82.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code: that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the

benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

83.     The Debtor submits that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied (and promptly) because the Purchase and Sale Agreement will require that the Successful Bidder cure all defaults associated with, or that are required to properly assume, the Contracts.   Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtor is confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.   However, the Debtor asserts that it is not in default of any of the Contracts; and therefore, no amounts are necessary to cure any defaults.

### C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.

84.     Similarly, the Debtor submits that the third requirement of section 365(b)(1)(C) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).   Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present

where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

85.     The Debtor believes that it can and will demonstrate that the requirements for assumption and assignment of the Contracts will be satisfied.  First, the Stalking-Horse Bidder certainly has the wherewithal to ensure that the counterparties to the Contracts (which will consist primarily of the tenants at The 800 Building) will receive the benefit of their original bargains.  Second, as required by the Bidding Procedures, the Debtor will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (as defined in the Bidding Procedures) (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Contracts.  Further, the Assumption and Assignment Procedures provides the Court and other interested parties with ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder(s) to provide adequate assurance of future performance and object to the assumption and assignment of the Contracts or proposed cure amounts.  The Court therefore should have a sufficient basis to authorize the Debtor to reject or assume and assign the Contracts as set forth in the Purchase and Sale Agreement.

### VI.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

86.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the [debtor] to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtor requests that the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are abrogated.

87.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 *Collier on Bankruptcy* ¶ 6004.11 (15 rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay should also be reduced to the amount of time actually necessary to file such appeal.  *Id.*

88.     To maximize the value received for The 800 Building, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtor hereby requests that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

89.     The Debtor has caused notice of this Motion to be given to the following parties: (a) the U.S. Trustee; (b) the Contract Counterparties; (c) all parties who have expressed an interest in The 800 Building; (d) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in The 800 Building; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) each governmental agency that is an interested party with respect to the Sale; (h) all known creditors of the Debtor; and (i) all parties who have filed appearances or requested notices through the Court's CM/ECF system in this chapter 11 case.  Further, after entry of the Bidding Procedures Order, the Sale Notice will be provided in accordance with the notice procedures

described herein. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### Waiver of Page Limit Restrictions

90.    Given the complexity of issues addressed herein, the Movants respectfully request that the 15 page limit established by Rule 5005-3(D) of the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois be waived for this Motion.

### No Prior Request

91.    No prior motion for the relief requested herein has been made to this or any other court.

*[Concluded on the following page.]*

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that this Court (a) enter the Bidding Procedures Order (i) approving the Proposed Purchaser (*i.e.*, 800 City Apartments LLC) as the stalking-horse bidder for The 800 Building, pursuant to the Proposed Purchase Agreement and approving the Stalking-Horse Protections; (ii) approving the Bidding Procedures; (iii) scheduling the Auction and the Sale Hearing; (iv) approving the Sale Notice; and (v) approving procedures for the assumption and assignment of the Contracts; and (b) at the conclusion of the Sale Hearing, enter an order substantially in the form of the Sale Order that, among other things, (i) approves the an asset purchase agreement for the Sale substantially in the form of the Proposed Purchase Agreement (ii) approves the results of the Auction, if any, and authorizing the Sale of The 800 Building to the Successful Bidder, and (iii) authorizes the assumption and assignment of the Contracts to the Successful Bidder

Dated: May 15, 2015

Respectfully submitted,

**THE 800 BUILDING, LLC**

By:   */s/ Phillip W. Nelson*
    One of Its Attorneys

David J. Fischer
Phillip W. Nelson
LOCKE LORD LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: 312-201-2000
Facsimile: 312-201-2555
david.fischer@lockelord.com
phillip.nelson@lockelord.com
*Proposed Counsel for the Debtor*