# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 1016 West Hollywood, LLC. | ) | Case No. 14 B 02696 |
| | ) | |
| Debtor. | ) | Judge Jacqueline P. Cox |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The 800 Building, | ) | Case No. 15 B 17314 |
| | ) | |
| Debtor. | ) | Judge Jacqueline P. Cox |

### Memorandum Opinion on Motion for Entry of
### Order Authorizing Foreclosure Action to Proceed
### (Dkt. No. 150)

## I. Background

1st Equity Bank Northwest ("1st Equity") seeks an order authorizing it to file a foreclosure case in state court and findings that neither the automatic stay nor the plan injunction prohibits it from doing so. The court will deny the Motion.

The Joint Chapter 11 Plan of Debtors 1016 West Hollywood, LLC and the 800 Building, LLC was confirmed on January 22, 2016. That Plan indicates at Article IV - Means for Implementation of the Plan - (C) that confirmation of the Plan will constitute authorization for the Reorganized Debtors to enter into the International Bank of Chicago ("IBC") Restructuring Support Agreement and the 1st Equity Restructuring Agreement. The IBC Restructuring Agreement was to be filed with the Plan Supplement.

## II. Relevant Plan Terms

The 1st Equity Restructuring Agreement was to include the following material terms:

1. For the purposes of the following agreements between the Debtors and 1st Equity, the effective date will be no later than January 28, 2016.

2. On the Effective Date, the reorganized 800 Building Debtor and 1st Equity will enter into the Note Purchase Agreement, pursuant to which the reorganized 800 Building Debtor will purchase the 1st Equity Note and Mortgage for consideration consisting of: (a) the $3.5 million 1st Equity Note Purchase Cash Payment; and (b) the $3.7 million 1st Equity Note Purchase Promissory Note. The 1st Equity Note Purchase Promissory Note will be guaranteed by Leon and Helen Petcov, will be secured as described below, and will mature on the 18-month anniversary of the Effective Date, providing that payments on the promissory note totaling (i) $1.2 million, if received on or before the 60th day following the Effective Date, or (ii) $1.4 million paid at any time thereafter until the note matures will satisfy the 1st Equity Note Purchase Promissory Note in full.

3. Pursuant to the Note Purchase Agreement, on the Effective Date, and concurrent with the 1st Equity Note Purchase Cash Payment, 1st Equity will assign the 1st Equity Note and Mortgage and the Guaranty Judgment (and related citations) to the reorganized 800 Building Debtor, and 1st Equity will receive a first-priority security interest in the 1st Equity Note and Mortgage as collateral for the 1st Equity Note Purchase Promissory Note. The Guaranty Judgment (and related citations) will be released by the reorganized 800 Building Debtor. The assignment of the 1st Equity Note and Mortgage will provide that the reorganized 800 Building Debtor will not hypothecate or otherwise assign the

1st Equity Note and Mortgage without the consent of 1st Equity until the 1st Equity Note Purchase Promissory Note is paid in full.

4. No later than the Effective Date, Leon and Helen Petcov will pay all outstanding real property taxes on the Glencoe House; provided, however, that - as a one-time exception - the first installment of the 2015 real estate taxes may be deferred until the time the second installment is due in 2016, as [sic] which time both installments will be paid in full along with any accrued penalties and interest. Failure to pay the 2015 taxes in full by the time the second installment is due in 2016 or, thereafter, to pay real estate taxes as and when each installment comes due will be events of default. Also no later than the Effective Date, Leon and Helen Petcov will also establish a property tax, insurance, and maintenance escrow (including for attorneys' fees for the successful valuation reassessment) (the "House Escrow") for the Glencoe House with 1st Equity funded as of the Effective Date in the amount of $25,000, and will make monthly payments into the escrow of $7,500 along with payment on the 1st Equity Note Purchase Promissory Note. It will be an event of default if the escrow is not established on the Effective Date or if the monthly payments are not made.

5. In addition to taxes and insurance, all costs and expenses attributable to maintaining the Glencoe House arising since December 1, 2105, will be paid from the House Escrow - including (without limitation): (a) the $10,453 fee for Edward T. McElroy & Associates for the 2015 assessed valuation reduction; (b) approximately $8,500 in repairs required by the insurer to maintain insurance in place on the Glencoe House, consisting of (i) installing smoke and $CO_2$ detectors; (ii) replacing the circuit breaker

panel cover; (iii) repairing foundation leaks; (iv) repairing damaged shingles; (v) cleaning and drying out wet carpet; (vi) closing and locking the laddervator; (vii) repairing damaged ceiling drywall; and (vii) mold inspection; and (c) all receiver fees and maintenance expenses for the Glencoe House beginning on December 1, 2015. 1st Equity will provide a total of all such costs and expenses it has borne since December 1, 2105, which will be paid from the House Escrow on the Effective Date. For the avoidance of doubt, the costs and expenses covered by this paragraph will not include 1st Equity's attorneys' fees.

6. The reorganized 800 Building Debtor will diligently prosecute the 1st Equity Note and Mortgage, including any guarantees, any judgments obtained as of the Effective Date, and any supplemental proceedings with respect thereto. To the extent that a judgment is obtained on account of the 1st Equity Note or any guarantee thereof, citations will issue and will be prosecuted against the judgment debtors. Furthermore, the reorganized 800 Building Debtor will provide 1st Equity will [sic] notice on all such court and supplemental proceedings. With respect to any foreclosure proceeding on the Glencoe House, the reorganized 800 Building Debtor will engage a lawyer reasonably acceptable to 1st Equity, pursuant to a $10,000 evergreen retainer, and will pay of [sic] such attorney's invoices within 60 days of the due date of such invoices, and failure to make such payments will be an event of default.

7. If the reorganized 800 Building Debtor obtains title to the Glencoe House prior to repayment in full of the 1st Equity Note Purchase Promissory Note, 1st Equity will receive a first-priority mortgage on the Glencoe House as security for payment in full of

the 1st Equity Note Purchase Promissory Note.

8. The reorganized 800 Building Debtor will not settle any claim with Fine Homes, Alex Loyfman, Michael Loyfman, Faina Loyfman, or their assigns and affiliates, including, without limitation, any claim related to the 1st Equity Note and Mortgage without: (a) the consent of 1st Equity, which consent will not be unreasonably withheld; or (b) payment in full of the 1st Equity Note Purchase Promissory Note.

9. Any Cash released to the Reorganized Debtors from the Fine Homes Claim Resolution Reserve and Cash recovery on the 1st Equity Note and Mortgage, including pursuant to a settlement with Fine Homes or Alex and Michael Loyfman, will be tendered to 1st Equity. If the 1st Equity Note Purchase Promissory Note has not been satisfied pursuant to its terms at the time of such Cash recovery is tendered to 1st Equity, it will be applied as a prepayment against the 1st Equity Note Purchase Promissory Note, and otherwise will be applied by 1st Equity in its discretion.

10. On the Effective Date, the reorganized 800 Building Debtor and Leon and Helen Petcov and 1st Equity will deliver the following documents to an escrow, to be transmitted (a) to 1st Equity upon an event of default (subject to 45 days' notice and right to cure such default) under the Restructuring Support Agreement, the Note Purchase Agreement, or the 1st Equity Note Purchase Promissory Note, or the maturity without payment in full of the 1st Equity Note Purchase Promissory Note or (b) to the reorganized 800 Building Debtor upon payment in full of the 1st Equity Note Purchase Promissory Note:

    (a) a quit claim deed to the Glencoe House, executed by Leon Petcov, Helen

Petcov, and the 800 Building Debtor, to be recorded by 1st Equity in the event of a default, provided that the 800 Building has completed the foreclosure on the Glencoe House or the 800 Building or Leon and Helen Petcov have obtained title to the Glencoe House prior to such event of default, and 1st Equity shall have discretion to accept or reject tender of such deed by escrow) [sic];

(b) a re-assignment of the 1st Equity Note and Mortgage to 1st Equity, to be recorded by 1st Equity if the foreclosure with respect to the Glencoe House is still ongoing at the time of such default under the 1st Equity Note Purchase Promissory Note;

(c) affidavits by each of Leon and Helen Petcov attesting to the enforceability of the 1st Equity Note Purchase Promissory Note and their guarantees in the event of such default;

(d) signed stipulations by each of Leon and Helen Petcov consenting to foreclosure relief with respect to the Glencoe House and agreeing to vacate the property within 45 days of such default;

(e) A waiver by Leon and Helen Petcov of their rights of redemption and homestead exemptions, if any, with respect to the Glencoe House;

(f) a tolling agreement by and among 1st Equity and Leon and Helen Petcov; and

(g) A release of all restrictions on the transfer and hypothecation of the 1st Equity Note and Mortgage and any subsequent mortgage or security interest granted to 1st Equity with respect to the Glencoe House.

11. On the Effective Date, the Guarantee Judgement will be transferred to the 800 Building Debtor and released, and any supplemental proceedings with respect thereto will be dismissed.

Article IV, Confirmed Modified Plan, Docket Number 127, pp. 23-26.

### III. Status of Transactions

The parties report that the $3.5 million 1st Equity Note Purchase Cash Payment was made on January 28, 2016. The court has been told that the $1.4 million to pay off the second part - the $3.7 million 1st Equity Note Purchase Promissory Note - is due July 28, 2017, but that the Debtors are ready to pay that amount by January 31, 2017. The Debtors allege, however, that 1st Equity has declared a default in an attempt to obviate the provision that allows the satisfaction of the $3.7 million portion with only $1.4 million. The Debtors dispute that the default has been properly declared.

The Debtors assert that as they were working to finalize the Plan, 1st Equity demanded at the last minute that the Plan had to become effective no later than January 28, 2016 to appease 1st Equity's regulators, although they had agreed that completion of the assignment documents would occur at the same time as the payment. Therefore the Debtors pushed to confirm the Plan and fund the $3.5 million payment by January 28, 2016, which occurred. The Debtors alleged that 1st Equity refused to push forward with the 70 Harbor foreclosure, wasting time. The Loan Sale Agreement and the Assignment Documents were not delivered by 1st Equity until the last day the 70 Harbor foreclosure sale could be completed without republishing the sale notice, two months after the Effective Date when the $3.5 million was received. The reorganized 800 Building Debtor was obligated under the deal to pay the $144,000 property tax

bill on 70 Harbor by August 1, 2016 and 1st Equity knew that the reorganized 800 Building Debtor would not be able to do so if it could not complete the 70 Harbor foreclosure and then either sell or refinance 70 Harbor before that date, which is what happened.

The Debtors allege that 1st Equity is trying to use the reorganized 800 Building Debtor's failure to pay the taxes as a basis to foreclose on 70 Harbor and reap a windfall.

The debtors also allege that 1st Equity refused to release its mortgage on the Hollywood Debtor's property on the Effective Date as provided for in the Plan. The Debtors alleges that 1st Equity's conduct jeopardizes the Debtors' restructuring efforts with the International Bank of Chicago.

## VI. Law on Post-Confirmation Jurisdiction

District courts may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district. 28 U.S.C. § 157(a).

A bankruptcy judge to whom a case has been referred may enter final orders on core proceedings arising in or under title 11, the Bankruptcy Code. Core matters include matters concerning the administration of the estate; allowance or disallowance of claims; orders in respect to obtaining credit; orders to turn over property of the estate; motions to modify the automatic stay; objections to discharge and orders approving the use or lease of property, including the use of cash collateral.

Arising under jurisdiction covers matters for which a claim is made under a provision of title 11, such as claims for damages for violations of the automatic stay as allowed by 11 U.S.C. § 362(k)(1). Arising in jurisdiction covers matters that are not based on a right expressly

created by title 11 but have no existence outside the bankruptcy case, such as administrative matters. *See Matter of Wood,* 825 F.2d 90, 96-97 (5th Cir. 1987).

This Motion is a core matter concerning the administration of the estate regarding which this court may enter a final order.

Bankruptcy judges may hear noncore, but related matters. In such matters the bankruptcy judge has to submit proposed findings of fact and conclusions of law to the district court, which reviews the proposal and enters final orders or judgments. 28 U.S.C. § 157(c)(1). Related matters are those whose outcome could have an effect on the estate being administered in bankruptcy. In *In re Xonics*, 813 F.2d 127, 131 (7th Cir. 1987) the Seventh Circuit held that a noncore proceeding is related to a bankruptcy case "only when the dispute is 'related to' the bankruptcy - meaning that it affects the amount of property available for distribution or the allocation of property among creditors." In *Xonics,* the Court noted that if payments to a debtor's other creditors under a reorganization plan would depend on the disposition of competing claims, related jurisdiction existed. *Id.,* at 132. The matters disputed herein affect the amount of funds 1st Equity will receive, $1.4 million or $3.7 million, implicating the amount of property available for distribution to it and conceivably how much will be available for other creditors.

Following confirmation of a Chapter 11 Plan the subject matter jurisdiction of a bankruptcy court is greatly reduced. This does not mean, however, that there is no post-confirmation jurisdiction and that the role of the bankruptcy court ends. The court retains jurisdiction to protect the confirmation order, to prevent interference with the execution of the Plan and to otherwise aid in the Plan's operation. *In re Kmart Corp.,* 359 B.R. 189, 195 (Bankr.

-9-

N.D. Ill. 2005).

In *In re Lazy Days' RV Center, Inc.*, 724 F.3d 418, 423 (3d Cir. 2013) the Third Circuit held that the issue of the validity of an anti-assignment clause in a lease was properly decided by the bankruptcy court after reopening because the bankruptcy court was well-suited to provide the best interpretation of its confirmation order. The Court said that the bankruptcy court had jurisdiction to interpret and enforce its own orders and to interpret a settlement agreement incorporated into a confirmed reorganization plan.

In *In re Brown's Chicken & Pasta, Inc.*, 503 B.R. 86, 88-89 (Bankr. N.D. Ill. 2013) this court ruled that bankruptcy courts have jurisdiction to determine the scope and effect of confirmation orders and found that the purchaser of restaurant equipment that belonged to the bankruptcy estate was entitled to turnover of same or a judgment in the amount of the equipment's value. This court also ruled that the purchaser had assumed an undisclosed franchise agreement despite the lack of a court order. In *Brown's* the debtor's principals asserted that restaurant equipment listed in its Schedule B, relied on by a purchaser who acquired it during the case, actually belonged to its president's mother, having been purchased by the mother twelve days before the debtor filed for bankruptcy relief under Chapter 11. The *Brown's* case highlights a critical reason bankruptcy courts should exercise post-confirmation jurisdiction in a narrow set of circumstances. Resolution of that matter required a ruling that an undisclosed franchise agreement had been assumed, allowing the purchaser a full remedy. A state court hearing the issue therein as a breach of contract action is not likely to make such a bankruptcy-centric ruling, a ruling that allowed a plan to be consummated and granted timely, full relief to the purchaser. State courts would probably ask the parties to return to bankruptcy

court to seek that kind of relief.

A district court recently reversed this court's finding of post-confirmation jurisdiction to rule on the extent and scope of a right of first refusal as applied to an entity that did not participate in a bankruptcy case, ruling that the dispute over a right of first refusal went beyond enforcement and implementation of the confirmed plan. *See Napleton Enterprises, LLC v. Bahary,* 2016 WL 792322, at * 7 (N.D. Ill. March 1, 2016). There the complaining party had not been given notice of the bankruptcy case. This case is different. Here the parties the Debtors complain about participated in the bankruptcy case and voted on the Plan which describes in detail what was expected of them.

1st Equity voted to accept the Joint Plan in the 800 Building case (15-17314) on January 20, 2016. *See* Amended Ballot at Docket Number 129. 1st Equity voted to accept the Joint Plan in the 1016 West Hollywood, LLC case (14-02696) on January 20, 2016. *See* Amended Ballot at Docket Number 219.

The issues herein involve implementation of the transactions described in the Plan. Certainly a state court can sort out some of these issues, however, this court can and should enforce and its confirmation orders when the issues involve transactions described therein. In addition, bankruptcy courts may have broader remedies available to resolve disputes such as subordination of a creditor's claim under 11 U.S.C. § 510 (c)(1) and (c)(2)[1] which allows, under

---

[1](c ) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may -
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
(2) order that any lien securing such a subordinated claim be transferred to the estate.

principles of equitable subordination, a bankruptcy court to subordinate for purposes of distribution, all or part of an allowed claim to all or part of another allowed claim or to order that any lien securing such a subordinated claim be transferred to the bankruptcy estate.

## V. Final Decree

After a Chapter 11 estate "is fully administered" the court issues a final decree closing the case. Federal Rule of Bankruptcy Procedure 3022. Entry of the decree should not be delayed solely because the payments required by the plan have not been completed. Factors courts should consider in determining whether the estate has been fully administered include (1) whether the confirmation order has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or its successor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced and (6) whether all motions, contested matters and adversary proceedings have been resolved. *See* 14 COLLIER ON BANKRUPTCY § 6.01[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). No final decree has been entered in this case. These bankruptcy cases have not been closed.

## VI. Retention of Jurisdiction in the Plan

Article XI of the Plan provides that the Court shall retain jurisdiction to resolve disputes and causes of action that arise in connection with the interpretation or enforcement of the Plan, and to issue injunctions and other orders to restrain interference in the enforcement of the Plan. Subsection 4 of Article XI includes jurisdiction to "[e]nsure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;"

## VII. Conclusion

The Motion for Entry of Order Authorizing Foreclosure Action to Proceed and for Other Relief will be DENIED. It would be premature to send this matter to state court when this bankruptcy case is still open and transactions required by the confirmation order have not been completed.

This Memorandum Opinion constitutes the court's conclusions of law. A separate order will be entered.

Dated: January 18, 2017          ENTERED:

_J. P. Cox_
**Jacqueline P. Cox**
**United States Bankruptcy Judge**